UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

LUIS CHARRIEZ,                                                    Civ. Case No. 23-cv-2283


                          Plaintiff,

        -against-

THE CITY OF NEW YORK,


                          Defendant.
---------------------------------------------------------------x


_____

**COMPLAINT**

_____


ADAM J. ROTH, ESQ.
LAW OFFICES OF ADAM J. ROTH
112 West 34th Street, 18th Floor
New York, New York 10016
(212) 922-3741
ajr@loajr.com


ROBERT C. REULAND, ESQ.
LAW OFFICES OF ROBERT C. REULAND, P.C.
26 Court Street, Suite 1400
Brooklyn, New York 11242
718-300-0626
robert@reulandlaw.com


ARTHUR L. AIDALA, ESQ.
AIDALA, BERTUNA & KAMINS, P.C.
546 Fifth Avenue
New York, New York 10036
212-486-0011
aidalaesq@aidalalaw.com


*Attorneys for the Plaintiff*

## TABLE OF CONTENTS

*Page*

NATURE OF THE ACTION ..................................................................................3

PROCEDURAL PREQUISITES, STATEMENT OF JURISDICTION AND VENUE .............................................................................................................5

PARTIES .........................................................................................................6

THE PROSECUTION .........................................................................................7

APPELLATE HISTORY .....................................................................................13

KCDA PROVIDES *BRADY* MATERIAL AND LUIS CHARRIEZ IS EXONERATED..................................................................................................14

BENEFITS CONFERRED UPON THE WITNESSES ...............................................16

FIRST CAUSE OF ACTION UNDER 42 USC 1983 FOR DELIBERATE INDIFFERENCE TO THE CONSTITUTIONAL RIGHTS OF THE PLAINTIFF ...................18

SECOND CAUSE OF ACTION MONELL AND 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF THE KCDA BECAUSE OF THE KCDA REGARDING WITNESS PAYMENTS.........................................36

JURY DEMAND ............................................................................................. 43

DAMAGES DEMAND .......................................................................................43

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

LUIS CHARRIEZ,                                          Civ. Case No. 22-cv-2283


                          Plaintiff,
          -against-

THE CITY OF NEW YORK,

                          Defendant.
---------------------------------------------------------------x


          Plaintiff LUIS CHARRIEZ ("Plaintiff"), by his attorneys, LAW OFFICES OF ADAM J.

ROTH, P.C., LAW OFFICES OF ROBERT C. REULAND, P.C., and AIDALA, BERTUNA &

KAMINS, P.C., complaining of the City of New York ("Defendant"), respectfully alleges, upon

information and belief, as follows:

## NATURE OF THE ACTION

          1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and state law, seeking

monetary damages for the Plaintiff due to his malicious prosecution, wrongful conviction, and

twenty-four year imprisonment caused by the pervasive misconduct of the Defendant.

          2.      The Plaintiff, Luis Charriez, was wrongfully convicted of Murder in the Second

Degree in connection with the death of a complainant, Larry Bird, after trial, by verdict rendered

December 16, 1997, before Justice David Friedman in the Supreme Court, Kings County. On

January 5, 1998, Mr. Charriez was sentenced to twenty-five years to life in prison.

          3.      More than twenty years thereafter, on September 30, 2019, Mr. Charriez moved,

under section 440.10 of the New York Criminal Procedure Law, to vacate his wrongful conviction

on the basis of his discovery of a scheme by Defendant to present several civilian putative

eyewitnesses at trial against him, without disclosing the receipt by such witnesses of numerous benefits and blandishments required by settled federal and state law to have been disclosed to Mr. Charriez before trial. By Order dated February 25, 2021, Justice Jane Tully of the New York Supreme Court, Kings County, granted Mr. Charriez's motion and immediately released him from custody on his own recognizance. Decision is attached as Exhibit 1.

4.      The Kings County District Attorney's Office (hereinafter "KCDA") then made a motion for renewal of their opposition to Mr. Charriez's successful motion for vacatur. On March 1, 2022, Justice Tully denied said motion in a decision that sharply disagreed with the KCDA's claim that they had, in fact, complied with their obligation to disclose to Mr. Charriez all material in their possession that could have been used on cross-examination of their purported "eyewitnesses" at trial. Decision on renewal is attached as Exhibit 2.

5.      Thereafter, the KCDA postured for over ten months, keeping Mr. Charriez's life in suspense while they went through the motions of preparing their supposed case against him for trial. Mr, Mr. Charriez and his attorneys duly prepared their defense as best they could, the long passage of years having deprived them, by death or disappearance, of three witnesses who testified on his defense a quarter century earlier.

6.      Then, January 27, 2023, the KCDA dropped all pretense and on its own motion moved to dismiss the indictment against Mr. Charriez, admitting at last what had been evident all along, i.e., that the KCDA was "unable to say that we would obtain a successful prosecution if we were to proceed." *See* Motion to Dismiss attached as Exhibit 3, and Certificate of Disposition annexed hereto as Exhibit 4.

7.      The reason that the KCDA was forced to admit they were "unable" to convict Mr. Charriez on retrial, of course, was that Mr. Charriez had obtained documentary proof that all

civilian witnesses at trial against him had been paid an enormous sum of money and benefits that unquestionably colored their trial testimony—a fact that was unknown to Mr. Charriez when he was tried and convicted in connection with the death of Larry Byrd more than twenty-five years earlier.

8.      The fact of this enormous payoff was unknown to Mr. Charriez at time of trial, of course, because the KCDA intentionally hid it from him, in spite of the constitutional imperative that they disclose it, knowing that had the defense access to this cross-examination material at trial Mr. Charriez would have been able to eviscerate the credibility of the civilian so-called "eyewitnesses" presented by the KCDA and open the ears of the jury to his own witnesses, who testified truthfully to the events of the night of the death of Larry Byrd.

## PROCEDURAL PREQUISITES, STATEMENT OF JURISDICTION AND VENUE

9.      On or about February 2, 2023, the plaintiff filed a Notice of Claim with the City of New York.

10.      On or about March 13, 2023, the defendant City of New York conducted a 50-H hearing.

11.      This action has been commenced within one year of the accrual of Plaintiff's cause of action. Under C.P.L.R. § 215(8), where a criminal action has been commenced arising out of the same conduct, the plaintiff shall have one year from the date of the termination of the criminal action (as defined by C.P.L. § 1.20) to bring the claim.

12.      C.P.L. § 1.20(16)[c] states that a criminal action terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case. In the instant case, the case was terminated with the final disposition of the accusatory

instrument by dismissal on January 27, 2023. *See* Transcript from January 27, 2023 attached as Exhibit 3 and Certificate of Disposition attached as Exhibit 4.

13.     Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

14.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343, and 1367.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## **PARTIES**

16.     Plaintiff, Luis Charriez, is a citizen and resident of the State of New York and of the United States.

17.     Defendant, City of New York, of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

18.     Defendant City of New York is a municipality that is a political subdivision of the State of New York, was the employer of all members of the KCDA and responsible for the policies, practices, and customs of the KCDA.

19.     Defendant City of New York, vis-a-vis the KCDA employed Timothy Gough and Dawn Bristol, the trial prosecutors for Kings Co. Indictment No. 1778/1997, i.e, *People v. Charriez*.

20.     Defendant City of New York, vis-a-vis the KCDA employed Assistant District Attorneys Michael Vecchione, Richard Safianow, Barry Schreiber, Robert Kaye, Larry Itzkowitz, and Amy Feinstein, all of whom were all employees of the KCDA during at least 1994-99.

21.     Defendant City of New York, vis-a-vis the KCDA employed Edward Michael Wishner who was responsible for the administration of KCDA's Witness Relocation Program and funds.

22.     Defendant City of New York employed Charles Hynes, the elected District Attorney of Kings County, New York, who was responsible for all of his conduct while he held elected office.

## THE PROSECUTION

23.     The KCDA contended at trial that on January 10, 1997, Mr. Charriez and the deceased, Larry Byrd, were involved in an altercation inside the hallway on the second floor of 172 Mitchell Street, Brooklyn, New York. The evidence showed that this location was utilized by persons addicted to crack cocaine and therefore was, in the idiom of the street, a "crack house." The KCDA further contended during the fight, Mr. Charriez plunged a knife one time into Byrd's chest in a fit of rage.

24.     Mr. Charriez, on the other hand, admitted to the struggle, but he denied any intention to kill Mr. Byrd, whom the evidence at trial showed no reason for Mr. Charriez to kill. Rather, the defense at trial contended Mr. Byrd was intoxicated on crack cocaine—a forensically-proven fact borne out by other testimony—at the time and acting paranoid, belligerent, and produced a knife. Mr. Charriez and two others, Robert Marshall and Felix Centeno, tried to calm Mr. Byrd. In the process of doing so, Mr. Charriez grabbed Mr. Byrd's jacket, but Mr. Byrd ripped away violently, and during a brief, ensuing struggle Mr. Byrd's knife regrettably punctured his own chest.

25.     Mr. Byrd was removed to Brookdale Hospital where he was pronounced dead. The medical examiner testified that the cause of death was a single stab wound to the chest with the

penetration of the heart. At the time of death, Byrd had a high level of cocaine in his body consistent with cocaine abuse.

26.     Two witnesses present at 172 Miller Street during the struggle, Felix Centeno and Robert Marshall, testified at trial on behalf of Mr. Charriez. Both supported Mr. Charriez's defense that Mr. Byrd was high on crack cocaine, that he was acting erratically and under the apparent influence of this powerful narcotic, that Mr. Byrd produced a knife during a brief struggle, that Mr. Charriez attempted to take the knife away from Mr. Byrd, and that the knife penetrated Mr. Byrd's chest during his struggle with Mr. Charriez.

27.     The prosecution, on the other hand, produced several civilian "witnesses" to the events and its immediate aftermath, to wit: Althemease Cort, (also known as Ramsey, Walton and Martin), Lee Walton, Marcus Lucien, Robert McCreary, and Nadine Bailey. These purported eyewitnesses shared several facts in common. First, they were all residents of 172 Miller Street at the time of Mr. Byrd's death. Second, they knew both Mr. Byrd and Mr. Charriez. Third, they were all persons of limited financial wherewithal living on the margins of society. Fourth, they all suffered addiction issues to a one degree or another. And fifth—most important for present purposes—each of the civilian "witnesses" arrayed by the KCDA against Mr. Charriez at trial received life-changing financial and in-kind benefits such as food and housing contemporaneous with their trial testimony against Mr. Charriez.  The housing and aid totaled, in the aggregate, more than $50,000, not a penny of which was disclosed to the defense before trial; in flagrant dereliction of the KCDA's constitutional duties owed to Mr. Charriez under *Brady/Giglio*.

28.     Justice Tully, below, in granting vacatur of Mr. Charriez's conviction on his motion under section 440.10 of the New York Criminal Procedure Law, discussed at length the proven fact that the testimony of the "witnesses" against Mr. Charriez was effectively purchased by the

KCDA pursuant to an unconstitutional policy and practice of conferring substantial benefits to witnesses and failing to disclose such benefits as required by law.

29.    On April 21, 1997, Mr. Charriez's trial counsel, Johnathan E. Weinrich, served an Omnibus Motion upon the KCDA seeking various relief, making inter alia a demand for

> all evidence or information which is exculpatory or favorable to the defendant either by indication of innocence or by potential impeachment or [sic] prosecution witness within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963); *People v. Wright*, 74 Misc. 2d 419 (1973).

30.    The KCDA, by the trial prosecutor Timothy G. Gough, served an undated Answer to Mr. Charriez's Omnibus Motion, stating in response to Mr. Charriez's *Brady* demand as follows:

> The People are currently unaware of any *Brady* or *Giglio* material and are aware of their continuing obligations with respect to any such subsequently discovered information.

31.    The trial court noted the KCDA's failure to make any *Brady* disclosure. In its decision on Mr. Charriez's omnibus motion, dated June 5, 1997 Justice David Friedman, ruled:

> Although the People assert that they are not in possession of any Brady material at this time, they are reminded that they remain under a continuing duty to provide defendant with any exculpatory material they may obtain in the future (*Brady v. Maryland*, 373 US 83).

32.    At trial, after the KCDA had conferred life-changing benefits upon its "witnesses," it was then the witnesses turn to give the KCDA their quid pro quo. They did not disappoint. One after another they took the stand to say precisely what was needed by the prosecutors to obtain a

conviction on the charge of murder: that Mr. Charriez had stabbed Mr. Byrd in the chest with criminal intent.

33.     Specifically, Nadine Bailey testified that she witnessed the struggle, seeing Mr. Charriez stab Larry Byrd. Later, she testified, she found a bloody knife on the third floor of the apartment building, later disposing of it. Tellingly, her testimony at trial was in direct conflict with a statement she gave to detective of the New York City Police Department at the 75th precinct station house on the night of the incident, when stated she did not witness the altercation.

34.     On cross-examination, deprived of the enormous cache of impeachment material hidden by the KCDA, Mr. Charriez's counsel was able to elicit little more from  Ms. Bailey than the lie that she had only spoken to prosecutors only a couple of times and spoke to the police twice. This falsehood was never corrected by prosecutor Timothy Gough nor his colleague Mr. Bristol. Indeed, Mr. Gough had the temerity to ask the following question and elicited, without correction the following testimony from Nadine Bailey:

> **Q:**     And finally, Ms. Bailey, have you received any promises whatsoever
>
> for your testimony here today?
>
> **A:**     No sir.

Trial at 110, lines 22-25.

35.     Ms. Bailey, of course, along with all the other civilian witnesses against Mr. Charriez at trial, had and was receiving enormous benefits from the KCDA at the time the trial prosecutor posed this question for the obvious purpose of creating in the mind of the jury the misbegotten idea that she was testifying freely and without any reason to favor the prosecution's chosen version of events.

36.     Marcus Lucien similarly testified for the KCDA. According to Mr. Lucien, on January 10, 1997, Mr. Charriez saw him on the street and admitted freely "I poked L," meaning of course Mr. Byrd. Mr. Lucien stated that when he and Robert McCreary learned Mr. Byrd had died, they tried to effectuate a citizen's arrest on Mr. Charriez. About a month later, Mr. Lucien identified Mr. Charriez in a line-up.

37.     On direct examination, the prosecutor Mr. Gough asked the following question and elicited the following testimony from Mr. Lucien:

> **Q:**     Now, at any point, Mr. Lucien, have you ever received any promises
>
> for your testimony here?
>
> **A:**     No.

Trial at 129, lines 18-20.

38.     As with Ms. Bailey, the falsehood knowingly elicited by the KCDA from Mr. Lucien went in to the trial record and before the jury uncorrected.

39.     Robert McCreary also testified for the prosecution. He corroborated Mr. Lucien's story that Mr. Charriez told him, "I just poked L." He also stated that rather than speak to police, he and Mr. Lucien attempted to apprehend Mr. Charriez themselves. Mr. McCreary also identified Mr. Charriez at a line-up on February 12, 1998.

40.     On direct examination, Timothy Gough asked the following question and elicited the following testimony from Mr. McCreary:

> **Q:**     Finally, Mr. McCreary, have any promises been made to you for
>
> your testimony here today?
>
> **A:**     None.

Trial at 190, lines 16-19.

41.     Again, the KCDA knowingly presented Mr. McCreary's falsehood to the jury without correction.

42.     Counsel for Mr. Charriez, deprived of more meaningful impeachment material hidden by the KCDA, was nevertheless able to elicit on re-cross-examination that Mr. McCreary received what appeared to be favorable treatment by the KCDA for his failure to perform community service on an earlier plea of guilt, a failure that ought to have resulted in incarceration.

43.     Althemease Cort also testified for the KCDA at trial against Mr. Charriez. As will be shown, Ms. Cort received the lion's share of financial and in-kind benefits distributed by the KCDA to the five civilian witnesses they enlisted against Mr. Charriez. She was doubly important to the KCDA, testifying as well as the sole identifying eyewitness in an unrelated murder prosecution against one Wildon Eric Rodriguez. (Mr. Rodriguez later brought on a motion for vacatur successfully premised upon the failure of the KCDA to abide by their disclosure obligations, resulting in his wrongful conviction for which he served some twenty years.)

44.     Ms. Cort testified at trial that she witnessed Mr. Charriez and the deceased, Mr. Byrd, struggling over a knife she stated was in Mr. Charriez's hand at the time she made her observations. She admitted, however, that she did not observe anyone stab Mr. Byrd.

45.     Fairlene Walton also testified for the prosecution. At the time, Ms. Walton and Ms. Cort were romantic partners. She also allegedly saw Mr. Charriez altercating with Mr. Byrd and saw a knife in Mr. Charriez's hand.

46.     On summation, the prosecutor Mr. Gough, stated to the jury in regard to his witnesses as follows:

> I submit to you ladies and gentlemen, that the way that testimony came out
> with those gaps; that the way there are three stages that fit together

perfectly, that shows that they were there, that they did see what happened,

and that they are telling the truth.

47.     Mr. Gough therefore, at the close of his case can be heard openly vouching for the credibility of his civilian "witnesses" despite knowing they had lied. Ultimately, of course, the jury accepted Mr. Gough's representation along with the testimony of his witnesses and convicted Mr. Charriez of murder on a theory of depraved indifference. Mr. Charriez was simultaneously charged with murder on an intentional theory—on which he was acquitted—a practice no longer countenanced under the jurisprudence of the State of New York. Mr. Charriez was thereafter sentenced to twenty-five years to life imprisonment.

## APPELLATE HISTORY

48.     The Appellate Division affirmed on Mr. Charriez's direct appeal. *People v. Charriez*, 273 A.D.2d (2d Dep't 2000). Leave to appeal to the New York Court of Appeals was denied. *People v. Charriez*, 95 N.Y.2d 864 (2000). No appeal to the United States Supreme Court was sought. Mr. Charriez moved for a writ of error coram nobis, claiming ineffective appellate counsel, and the Appellate Division denied the motion. *People v. Charriez*, 286 A.D.2d 774 (2d Dep't 2001).

49.     Mr. Charriez then moved in the trial court under C.P.L. § 440.10 on various grounds unrelated to *Brady*. The motion was denied on the ground that his claims were procedurally barred or without merit. Applications for certificates to appeal to the Appellate Division and then to the Court of Appeals were denied. Mr. Charriez moved for the second time in the Appellate Division for a writ of error coram nobis, and the motion was denied. *People v. Charriez*, 21 A.D.3d 1036 (2d Dep't 2005). An application for leave to appeal to the Court of Appeals was denied. *People v. Charriez*, 5 N.Y.3d 882 (2005).

50. Thereafter Mr. Charriez filed a second C.P.L. § 440.10 challenge to his conviction, again on other grounds than *Brady*. The motion was denied, and applications for certificates to appeal to the Appellate Division and the Court of Appeals were also denied.

51. For a third time Mr. Charriez moved for a writ of error coram nobis, arguing ineffective appellate counsel. The motion was denied. *People v. Charriez*, 43 A.D.3d 1075 (2d Dep't 2007). Leave to appeal to the Court of Appeals was denied. *People v. Charriez*, 9 N.Y.3d 1005 (2007). Mr. Charriez then moved in the trial court for DNA testing pursuant to C.P.L. § 440.30(1-a). The motion was denied. A subsequent motion for reargument and renewal of defendant's motion for DNA testing was denied. Applications for certificates to appeal this denial to the Appellate Division and the Court of Appeals were denied. Federal habeas corpus petition was denied. *Charriez v. Greiner*, 265 F.R.D. 70 (E.D.N.Y. 2010).

## KCDA PROVIDES *BRADY* MATERIAL AND LUIS CHARRIEZ IS EXONERATED

52. In 2013, Charles Hynes was voted out of office by the people of Kings County.

53. Thereafter, in response to a Freedom of Information Law request, the KCDA turned over copies of the checks written by the KCDA to Althemease Cort, also known as Ramsey, for over $35,000 for moving expenses for herself and Fairlene Walton, checks written to Nadine Bailey, Marcus Lucien, and Robert McCreary. *Brady* material attached as Exhibit 5, 6, 7, and 8.

54. Mr. Charriez then made a section 440.10 motion in New York Supreme Court, Kings Country, which was granted by Justice Jane Tully on February 25, 2021. The KCDA renewed its opposition, which Justice Tully rejected with a written opinion and order dated March 1, 2022.

55. The KCDA then postured as though the case would be retried for nearly a year before at last, on January 27, 2023—realizing the impossibility of carrying their burden of proof

after trial, owing to the discovery by the defense of the hidden volumes of impeachment material—moving before Justice Tully to dismiss the indictment. Justice Tully duly granted the People's application, ending at last the faulty criminal proceedings against Mr. Charriez more than twenty-five years after they began.

56.     Plaintiff sat for a 50-H hearing on or about March 13, 2023.

57.     All predicates to bring an action against the City of New York have been met, and the claim is ripe for adjudication.

58.     Plaintiff spent over twenty-four years wrongfully imprisoned.

59.     Plaintiff's injuries and damages include, but are not limited to:

a.     His malicious prosecution and conviction for murder and sentence of 25 years to life in prison;

b.     His false arrest and imprisonment resulting in his loss of liberty for a total of twenty-one years, including over two years in solitary confinement and over two years in lock keep;

c.     Past and future physical illnesses and injuries resulting from his wrongful conviction and his time in prison;

d.     Past and future mental and emotional injuries and suffering;

e.     The loss of the services, society, companionship, and consortium of his family and friends;

f.     The loss of educational and professional opportunities;

g.     The loss of quality of life;

h.     The loss of employment income; and

i.      Legal fees and expenses.

## **BENEFITS CONFERRED UPON THE WITNESSES**

60.     Plaintiff respectfully refers this Court to Judge Tully's decisions on the motions for the sake of brevity.

61.     However, as is demonstrated in Exhibits 5, 6, 7 and 8 hereto, the KCDA provided each of the witnesses in Mr. Charriez prosecution substantial benefits, all of which were intentionally kept from the defense, depriving him of the opportunity of a fair trial, including the following.

62.     Bailey and her boyfriend Robert Franklin participated in the KCDA's Witness Relocation Program from September 15, 1997 to February 3, 1998, which included payments for hotel stays, a new apartment, realtor fees, furniture, bills, and personal items.

63.      On September 22, 1997, the KCDA provided Bailey and Franklin with money for bus travel and "start-up" money. The KCDA also provided meal allowances to Bailey and Franklin from September 1997 to January 1998.

64.     On February 16, 1997, Lucien and McCreary accepted the KCDA's offer to participate in the Witness Relocation Program, and the KCDA arranged for them to stay at a hotel. In May 1997, the KCDA paid for Lucien and McCreary to move into new apartments, realtor fees, security fees, and first-month rents, as well as furniture and household items for the new apartments.

65.     Lucien and McCreary were provided with meal allowances from February 1997 to May 1997. Lucien was provided with checks to pay his rent for August through December 1997.

66.     On October 9, 1997, the KCDA provided McCreary with money for cab fare and a meal.

67.     On December 10, 1997 , the same day as Ramsey's testimony, Cort entered into the Witness Relocation Program along with Walton and Ramsey's children. Cort participated in the program from December 10, 1997, to April 1999, during which time the KCDA paid for the cost of hotel stays, a new apartment, rent, furniture and meal allowances, totaling over $35,000.00.

68.     Ramsey's participation in the program was due to her cooperation in this case. Cort was a witness in an unrelated case, People v Carver, and Cort cooperated with the police in the investigation of a homicide case, *People v Rodriquez*, Kings Co. Ind No. 4116-1994.

69.     Although the KCDA deny that Cort received any leniency on her open criminal cases, the People admit that Cort's relationship with the KCDA and the NYPD began in 1994, when Cort first cooperated with the police on the Carver prosecution.

70.     The KCDA also affirm that on September 10, 1997, they took Cort into custody pursuant to the issuance of a warrant for Cort's arrest on an open probation case. The KCDA arranged for Cort to stay in a hotel overnight and provided Cort with meal allowances on September 10 and 11, 1997. On September 11, 1997, the KCDA brought Cort to court to vacate the warrant, only after her testimony against the defendant. On December 10, 1997, the KCDA learned that Cort was in North Carolina and transported her back to Brooklyn to testify.

71.     It is unclear whether Cort signed the papers to participate before or after her testimony on December 10, 1997. The paperwork filled out by the KCDA for the Witness Relocation for Cort bears the indictment number 1778- 97, under which Mr. Charriez was indicted. The KCDA also conceded in litigation in the People v Rodriguez case that Cort was placed in the Witness Protection Program because of her cooperation in this case. By a decision dated April 2019, the Hon. Guy Mangano Jr., of the New York Supreme Court, Kings County, granted Mr. Rodriguez's section 440 motion, finding—as subsequently did his colleague, Justice Jane Tully,

in the instant case—that the KCDA had failed to disclose an alarming amount of benefits conferred upon Cort, then known as Ramsey. Justice Mangano's decision was affirmed by Appellate Division. *See People v. Rodriguez*, 186 A.D.3d 1724 (2d Dept 2020).

### FIRST CAUSE OF ACTION UNDER 42 USC 1983 FOR DELIBERATE INDIFFERENCE TO THE CONSTITUTIONAL RIGHTS OF THE PLAINTIFF

72.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 71 of this Complaint.

73.     The Second Circuit Court of Appeals held in *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019), that a prosecutor's failure to disclose that witness was paid $2500 in housing allowance was actionable in a civil suit for damages.

74.     At the time of Plaintiff's original prosecution, and continuing until the people of Brooklyn voted out District Attorney Charles J. Hynes as the manager and chief administrator of the KCDA, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Kings County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, *Brady* violations, reliance on false or misleading evidence and argument at trial ("the policy"), and covering up the same.

75.     This policy began with Hynes' induction as District Attorney in 1990 and continued until his removal from the office.  Exhibits 9 and 10 are list of reversed convictions for misconduct and settlements related to the same.

76.     Said policy permitted, encouraged, or acquiesced in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective-investigators, and NYPD detectives working with the KCDA, particularly in high profile or

serious cases where arrest and conviction is most desired by the KCDA. The policy led directly to the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiffs wrongful imprisonment and other damages.

77. More specifically, it was the policy of Hynes and the KCDA to directly encourage, or be indifferent to and thereby indirectly encourage, prosecutors, detective-investigators, and NYPD detectives working with them to abuse lawful process to gain custody of vulnerable witnesses in order to coerce them into giving inherently unreliable or false testimony favorable to the prosecution. The above law enforcement officials would use the following illegal tactics to coerce witnesses:

> a.   Issuing unauthorized and unlawful "office" subpoenas to compel witnesses to attend interviews at their office, despite numerous judicial decisions making clear that such process was unlawful;

> b.   Lying to courts about their need and entitlement for material witness warrants, thereby obtaining authorization to bring purportedly recalcitrant witnesses directly to court for appointment of counsel and a judicial hearing, only to then effectively kidnap the witnesses and hold them either in the KCDA offices or in a hotel room, where they would threaten, intimidate, or cajole them into "cooperating" and remaining in their custody until completing their testimony at trial;

> c.   Misleading courts to issue orders allowing them to take custody of incarcerated witnesses and interview them at the KCDA offices in

the presence of the witnesses' counsel, only to then interrogate such witnesses without notifying their counsel;

d.     Causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

e.     Coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out a carrot stick of leniency and monetary reward.

78.     It was Hynes's policy as well to tolerate (and thereby encourage) violations of the KCDA's constitutional obligation to make timely disclosure to the defense of exculpatory or impeachment information know as *Brady* material. His deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Plaintiff's case. *See* Monique Ferrell Affirmation in Opposition to Jabar Collins' C.P.L. § 440.10 Motion, dated Nov. 3, 2006. (The KCDA's "usual practice" is to notify the Division of Parole that a parolee or inmate on work release is not cooperating so that it will take him into custody and make him "available," terming this an"[e]ntirely routine practice"); Ferrell, Supplemental Affirmation dated Nov. 9, 2006, (The "practice of this Office" is to notify a supervising agency when a parolee "misses appointments and refuses to cooperate").

79.     It was Hynes' policy to continue to deny that *Brady*/*Giglo* material existed.

80.     It was Hynes' policy to hide benefits given to witnesses from trial attorneys, and have those assistant district attorneys' misrepresent to the jury that "the witness had no reason to lie."

81.     It was Hynes' policy to have the appellate attorneys emphasize that the witnesses credibility had no reason to be questioned.

82.     In this regard, prosecutors and investigators were permitted and/or encouraged to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "Rosario material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the KCDA's "riding" policy, prosecutors were permitted and even encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt.

83.     Hynes's prosecutors were permitted and/or encouraged to withhold recantation evidence, as well as statements and evidence, including 911 tapes, tending to prove a defendant's innocence, unless they "believed" such evidence, thus depriving the defense and the jury of vital information, required to be disclosed under *Brady*, that was necessary to evaluate witnesses' credibility and defendants' guilt or innocence.

84.     Prosecutors, in violation of *Brady*, were permitted and/or encouraged to refrain from disclosing material witness applications, orders, and proceedings, relocation assistance promised or provided to witnesses, and other pressure tactics, promises, or rewards used to influence witnesses.

85.     Prosecutors were permitted and/or encouraged not to comply with the Office's ongoing *Brady* obligations after trial, to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, or through FOIL requests, and to even lie to or mislead courts in affidavits and testimony, all in order to cover up the original misconduct and defeat defendant's efforts to expose misconduct and overturn wrongful convictions.

86.     While prosecutors were told in theory to comply with their *Brady* obligations, they were not told there would be any negative consequence to them if they failed to, and in fact there was none.

87.     Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

88.     Despite dozens of court decisions, finding that KCDA prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, Rosario, or statutorily-mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined. They were not fired or suspended, fined, or demoted. Notations were not placed in their personnel files. They were not reported to outside disciplinary bodies. To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, Hynes almost always defended the propriety of his assistants' behavior, thereby ratifying it or at least signaling his tolerance of it- just as he did in Plaintiff's case- and such personnel continued to receive raises, bonuses, and promotions.

89.     During depositions in *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (OLP) (S.D.N.Y.), the former Chief of Investigations for Hynes, Dennis Hawkins, and Hynes's Counsel testified. A number of cases handled by Hynes's office during the time period of

Plaintiff's prosecution evidence the above polices and patterns of misconduct by Hynes's staff and Hynes's approval or toleration of such behavior.

90.     Early in his tenure, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending the KCDA's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred, according to the New York Court of Appeals' opinion:

> [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney's office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's post arrest and post incarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody.

79 N.Y.2d at 177.

91.     Dino Ameroso, counsel to Charles Hynes, acknowledged that there was no formal disciplinary procedures or policies, and they were unaware of any ADA having ever been disciplined during Hynes's tenure for misconduct committed during the investigation or prosecution of criminal allegations. Further, the City Law Department acknowledged, with respect to a list of court decisions involving *Brady* and related violations, that no discipline had been imposed on any of the prosecutors. Hawkins admitted the Office had no written policy for disclosing *Brady* material.

92.     Hawkins and ADA Theresa Corrigan, who also gave a deposition, admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses. Finally, Hawkins testified that, despite having virtually daily contact with Hynes over many years, he had not once ever heard him discuss the training of ADAs in such areas. Although the defendants in the *Zahrey* lawsuit did not admit liability, judgment was entered against Corrigan and Charles Guria, the chief of Hynes's Civil Rights Bureau who reported to Vecchione, individually (and against the City of New York and three former detective-sergeants), in 2009, for $750,001, plus counsel fees, pursuant to F. R. Civ. P. 68, to resolve Zahrey's lawsuit alleging malicious prosecution and manufacturing of false testimony during 1994-95, but Hynes's conducted no investigation and imposed no discipline on Guria or any other prosecutor for their conduct of the matter.

93.     In reversing the conviction, the Court condemned the "egregious" behavior of the KCDA in "'legally' coerce[ing Lawrence's] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience").

24

94.     That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized. "Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to maintenance of the integrity of the criminal justice process." Id.

95.     Shortly after the Russ decision, prosecutors under Hynes showed that they would take their lead from Hynes, not the Court of Appeals.

96.     In *People v. Ruddy Quezada*, police detectives working with the KCDA secretly arrested the prosecution's principal witness, Sixto Salcedo, on a material witness order the KCDA had obtained. Instead of taking him to court, they kidnaped him, and held him with his wife incommunicado at the Marriott Hotel at LaGuardia Airport, where they threatened him with prison unless he conformed his trial testimony to his grand jury testimony. Neither the material witness order, the detention at the hotel, nor the other coercive threats to this witness was disclosed to the defendants, who were convicted.

97.     The Court reversed the conviction on the ground that the prosecution had violated thedefendant's rights by misusing the two recanting witnesses' hearsay grand jury testimony as the basis for the jury to convict.

98.     Years later, Salcedo recanted his trial testimony, and other witnesses emerged showing that the defendant, contrary to the KCDA's case, had not committed the shooting. When Quezada, in 2003, moved in State court to vacate his conviction, the trial prosecutor, who was stillin the office, ADA Ephraim Shaban, presented the sworn testimony of the detective, Thomas Buda, to deny that any material witness order had been obtained, that Salcedo had been arrested, or that he had been held at a hotel, and argued that Salcedo's

"false" allegations of coercion undermined the credibility of his recantation. *See People v. Quezada,* 16 Misc. 3d 1113(A) (Sup. Ct. Kings Co. 2007) (Gerges, J.). The KCDA were successful. The court denied the defendant's motion, leave to appeal was denied, and it appeared he would never be able to challenge his conviction, since he already had lost a federal habeas corpus petition and by law had the right to bring just one.

99.     However, in a highly unusual decision, the United States Court of Appeals directed that the Federal District Court permit Quezada to pursue his second habeas petition. *See Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010).

100.     Just as in Plaintiff Mr. Charriez's case, Quezada's attorneys sought discovery, and the KCDA then had no choice but to reveal the truth that it had been falsely denying, through knowing reliance on perjury, for seven years: there was a material witness application and warrant, and there were records showing that Salcedo had been held at the Marriott Hotel at LaGuardia Airport.

101.     Shortly after the trial in the Quezada case, the same judge who had presided, Justice Abraham G. Gerges, denounced the practice of the KCDA to misuse the court's subpoena process to coerce witnesses. In a decision published July 7, 1994, Justice Gerges, in still another murder case being prosecuted by Vecchione's bureau, condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the KCDA that the "practice should not be replicated." *People v. Neptune*, 161 Misc.2d 781,785,615 N.Y.S.2d 265,267 (Sup. Ct. Kings Co. July 7, 1994) (emphasis added) (quoting *People v. Natal,* 75 N.Y.2d 379, 385 (1990)).

102.    Immediately thereafter, in another murder case prosecuted by Hynes's Homicide Bureau, *People v. Brian Bond,* Kings Co. Ind. No. 13991/91, the assigned prosecutor defied  Justice Gerges and  the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based. ADA Stan Irvin and detective-investigators working under his direction illegally subpoenaed all prospective witnesses to their Office to coerce them to submit to office interviews before testifying at the trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

103.    One witness, a crack addict named Carmen Green, had told police detectives anddetective-investigators that she had not seen the incident in question at all. When KCDA detective-investigators found her, they noted that she was too "impaired" to comply with the subpoena. They knew as well that she was under investigation for, and feared, that she and her children would be arrested for dealing drugs out of her apartment.

104.    Obtaining a material witness warrant authorizing Green to be taken "forthwith" to court, where an attorney would be appointed for her, Irvin instead had her brought to his Office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours. Only after she agreed to remain in their custody "voluntarily" did they finally bring her to court, after midnight, so that a judge could sign an order ratifying her "consent" to be detained until the conclusion of her testimony.

105.    The prosecutor, ADA Irvin, then violated the KCDA's *Brady* obligations by not disclosing to the defense Green's prior statements denying having seen the shooting, her eight- hour unlawful interrogation, her "impairment" on drugs, the threats to arrest her and her family, and promises to relocate her at public expense. Nor did he disclose the statements

of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance. Bond was convicted, in December, 1994, of murder.

106.    During an evidentiary hearing held in 1998 concerning Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic ADA Irvin testified that it was the Office's regular practice to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the D.A.'s Office.

107.    In 2000, the New York Court of Appeals vacated Bond's conviction due to the Office's failure to disclose Green's statements denying having seen the homicide. The Office's Appeals Bureau had argued, on behalf of District Attorney Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

108.    In August and September, 1994, during the KCDA's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of ADA Charles Guria obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with Guria's approval, interrogated him without notifying his attorney.

109.    In March, 1995, after Quick had been sent upstate to serve his sentence, detectives, with Guria's approval, again met with Quick without his attorney, and, through a combination of coercion and excessive promises of speedy release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to Guria,

who listened to it, heard the coercion and improper promises, and heard the encouragement of Quick to adopt a false story. Remarkably, rather than condemn the detectives' tactics, he told them that Quick's statements were "promising."

110.    In or about January 1996, detectives working directly under Guria's supervision arrested several other individuals in the hope of turning them into State's witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their right to counsel and to prompt arraignment.

111.    Because none of Quick's false story could be corroborated, which is a prerequisite for prosecution under New York, but not federal, law, Guria and his colleagues obtained Hynes's approval to recommend the case to federal authorities for prosecution. However, in doing so, they did not disclose the tape, the improper interrogation tactics used with Quick, or numerous of Quick's prior inconsistent statements. When Quick inadvertently disclosed to the federal prosecutor that he had been taped, Brooklyn ADAs delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case. Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

112.    One of the prosecutors, ADA Theresa Corrigan, testified at a deposition that, pursuant to her training at the Office, she did not believe she was under any obligation to disclose to the defense prior inconsistent statements or "recantations" if she did not find such statements to be credible or true. This was the position that the Office took in the Brian Bond appeal. She also testified to her training not to make any record of witness statements to avoid disclosure under *Rosario*.

113.    Also in 1994, Hynes ratified the misconduct of his Office in the Sarni Leka murder prosecution. Leka was convicted, in March, 1990, early in Hynes's tenure as District Attorney, of murdering a relative on a Brooklyn street. Shortly after the conviction, Leka moved to vacate his conviction because the prosecution had actively suppressed from the defense its knowledge that an off-duty police officer's observation of the shooting from his apartment window was flatly inconsistent with the KCDA's proof at trial, which consisted of the highly questionable identification testimony of two traumatized passersby, and had suppressed two other witnesses' potentially exculpatory statements. Not only did Hynes's office vigorously oppose the defendant's motion and appeal; Hynes wrote Leka's new defense counsel that he had ''personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process rights as a defendant were amply and ably protected."

114.    However, in 2001, the United States Court of Appeals vacated Leka's conviction, finding that the KCDA had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the KCDA was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison. In 2008, the City of New York settled Leka's Monell lawsuit based upon the KCDA's *Brady* violations for $3.1 million.

115.    Hynes had been on notice over the years, beginning before Plaintiff's trial, of credible allegations of overzealousness and misconduct directed specifically at Vecchione, but had consistently encouraged misconduct by KCDA, just as he had encouraged the rest of his staff, by his indifference to such allegations.

116.    In February 1995, which was prior to Plaintiff's trial, defendant Frank Rodriguez, who had been convicted at trial in October 1993 (*People v. Rodriguez*, Kings Co. Ind. No. 9893/92), documented in his appellate brief that KCDA had blatantly violated numerous fundamental rules of trial behavior. The brief showed that KCDA repeatedly and sarcastically asked the defendant on cross-examination whether the other witnesses in the case were lying—despite numerous appellate decisions decrying such a tactic. In summation, the brief showed, KCDA had improperly ridiculed the defense as "laughable," improperly argued that the defendant wanted the jury to believe only he was telling the truth while all the KCDA's witnesses were lying, and impermissibly vouched for the KCDA's witnesses as not "the type" of people who would lie.

117.    In early 1995, also before Plaintiff's trial, Hynes's office opposed the motions of defense lawyers in *People v. Steven Ruiz, et al.*, Kings Co. Ind. No. 12848/94, which exposed KCDA's improper practice of using "office" subpoenas to compel witnesses, including the defendant, to appear at his Office for interviews without counsel. Supreme Court Justice Robert Kreindler found that the Homicide Bureau (led by KCDA) had utilized such "office" subpoenas "unethically and abused court process," and that they had "improperly denied [the defendant's] request for an adjournment of the subpoena in order to obtain counsel." KCDA's conduct was particularly egregious because it came after Justice Gerges's decision directing the KCDA to no longer misuse subpoenas in this fashion.

118.    KCDA's misconduct reached new heights (and was eerily similar to his misconduct in Plaintiff's case), and was fully exposed to Hynes, in the Office's triple murder prosecution of Jeffrey Marshall. During the first trial in March, 1993, KCDA represented, and had his key rebuttal witness, Cicero Murphy, testify, that Murphy was a "volunteer" witness,

that KCDA had made no promises to Murphy, and that Murphy expected no benefit in return for his testimony. Murphy testified that he had only weapon possession and assault cases open, and that there was no relationship between these open cases and his testimony. Marshall was convicted of robbery and received a sentence of 12 ½ to 25 years in prison.

119.    KCDA's homicide bureau then brought Marshall to trial in two additional murder cases. The ADA whom KCDA assigned to handle these two cases, and who was working under his supervision, did not disclose any cooperation agreement between the KCDA and Murphy, and Murphy testified in 1994 that there wasn't any. (In both cases, Marshall was acquitted.)

120.    Shortly thereafter, the Nassau County District Attorney's Office prosecuted Marshall in an attempted murder case and wrote the KCDA to find out whether the KCDA had any cooperation agreement with Murphy. KCDA personally responded, by letter dated January 17, 1995, unequivocally denying that the KCDA had any such agreement. Despite Murphy's testimony, Marshall was acquitted.

121.    Following Marshall's robbery conviction, on January 12, 1996, Marshall, represented by new counsel, moved, pursuant to C.P.L. § 440.10, to vacate his conviction. New counsel's investigation had revealed that KCDA, after the first trial, had written to the State Division of Parole on Murphy's behalf to assist Murphy in obtaining an early release, and four days later had personally entered into a formal written cooperation agreement with Murphy to testify in the next two cases. The agreement allowed Murphy to receive a mere two-year sentence in satisfaction not only of his gun charge but also of his pending first degree rape charge, for which he faced up to 25 years in prison—a charge that KCDA had not disclosed to the defense at Marshall's first trial.

122.    Murphy's motion also included KCDA's letter to the Nassau County District Attorney's Office denying the existence of the formal written cooperation agreement that KCDA had signed.

123.    To defeat Marshall's motion, KCDA then signed a sworn affirmation (also eerily similar to the false affirmation he executed to oppose Jabar Collins' successful section 440 motion), containing the following false assertions of "fact": that KCDA had never discussed any benefit with Murphy before his initial testimony; that KCDA did not even know at the first trial that Murphy was facing a rape charge; that KCDA did not know that his subordinate had not disclosed the written cooperation agreement before the second and third trials, and that KCDA somehow had misunderstood the Nassau County DA's inquiry when KCDA represented that "There are no agreements between this Office and Cicero Murphy". Based upon KCDA's affirmation (as in Plaintiff's case), a state judge denied the defendant's section 440 motion without a hearing.

124.    Hynes then rewarded Vecchione with a promotion to First Deputy District Attorney. Neither Vecchione, nor any other ADA, was disciplined in any respect for the misconduct—remarkably similar to Plaintiff's case—that occurred in the Marshall case.

125.    In March 2000, Justice Alan Marrus dismissed an indictment of a businessman, Sam Lustigmann, in an obstruction of justice case, because KCDA had caused a grand jury to indict him despite having given him immunity from prosecution in exchange for his cooperation during an office interview. While KCDA claimed that his agreement with Lustigmann was voided by the latter's withholding of material information, the court rejected this defense because of KCDA's failure to record or take any notes during the interview.

126.    For the sake of brevity, the plaintiff respectfully refers to the substantiated allegations contained in *Jabbar Collins v. City of New York*, 11-cv-766 EDNY as to additional misconduct by the KCDA.

127.    In short, Charles Hynes encouraged, aided and rewarded the systematic deprivation of defendants' constitutional rights in order to secure convictions against innocent defendants.

128.    In the instant case, Vecchione signed multiple checks issued to Altheamease Cort but none of this material was provided to the defense. Nonparty Cort was given an illegal sentence on 2 felonies and let off on many lesser crimes because of her cooperation. However, with zeal, the KCDA denied that Ms. Cort had any reason to lie or fabricate evidence for over 15 years. The pattern of conduct was rewarded and lauded by Hynes.

129.    As a direct result of these policies, Plaintiff Mr. Charriez was wrongfully convicted of murder and spent over 24 years in State Prison.

130.    The KCDA office denied the existence of *Brady* material for over 15 years and it was not until Charles Hynes was voted out of office that the truth came to light.

131.    The KCDA under Hynes systematically deprived defendants of *Brady/Giglio* material and violated the following Constitutional guarantees

    a.    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable evidence, including the statements and testimony of a witness who had been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution;

b.     Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

c.     To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v Maryland*, 373 U.S. 83 (1963), *Giglio v United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

132.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendant and its co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's malicious prosecution without probable cause, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, the defeat and delay of his efforts to overturn his wrongful conviction, and his other injuries and damages.

133.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendant's employment and authority.

134.    Defendant committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

135.    By reason of the foregoing, the Defendant is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**SECOND CAUSE OF ACTION *MONELL* AND 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF NEW YORK FOR ACTIONS OF THE KCDA BECAUSE OF THE KCDA REGARDING WITNESS PAYMENTS**

136.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 135 of this Complaint.

137.    "A municipality's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Collins v. City of New York*, 923 F. Supp. 2d 462, 476 (EDNY 2013) (internal citations omitted). "Deliberate indifference may be inferred if the complaints of wrongdoing are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*, quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

138.    The City of New York, via *Monell*, may be held liable for prosecutors (1) failing to disclose *Brady* material (including failure to disclose financial benefits and leniency on pending cases) and (2) summation misconduct. *Bellamy v. City of New York*, 914 F.3d 747 (2d Cir. 2019) (reversing the district court and holding, inter alia, the prosecutor's failure to disclose $2800 benefit promised to cooperating witness raised a question of fact at to *Monell* liability).

139.    Because of the KCDA's policy to hide benefits conferred on witnesses, the trial prosecutor Timothy Gough, who had the knowledge of the financial and housing benefits that were conferred on witnesses, did not disclose of the extensive benefits given to each of the witnesses against Mr. Charriez. As a result, Mr. Charriez was deprived of his constitutional right to this specific *Brady*/*Giglio* material.

140.    In 1994/1995 the law was well established that such an intra-office "wall" would avoid disclosing to the trial prosecutor the promises of benefits made to witnesses. This policy was found to violate defendants' constitutional rights. *Giglio v. U.S.*, 405 U.S. 150 (1972); *People v. Novoa*, 70 N.Y. 2d 490 (1987). In the instant case, the failure of the trial prosecutor to disclose the benefits provided to witnesses deprived Mr. Charriez of his constitutional right to a fair trial.

141.    Thus, the City of New York, and its policy making agents, such as Charles Hynes was on notice that such policy was unconstitutional.

142.    Upon information and belief, as a result of this policy, numerous defendants were deprived of this specific *Brady*/*Giglio* material.

143.    In the instant case, for over 15 years, the KCDA hid that it had provided financial benefits to Ms. Cort, Ms. Bailey, Ms. Walton, Mr. McCreary, and Mr. Lucien. Only after Charles Hynes was voted out of office did the KCDA disclose it had paid these witnesses. The trial prosecutor, Timothy Gough, was aware that several of the witnesses had been conferred substantial benefits in exchange for their cooperation. However, he actively elicited testimony to the contrary and denied that any *Brady* or *Giglio* material existed.

144.    Timothy Gough was never reprimanded or censured for these actions. In fact, he was repeatedly promoted within Hynes' KCDA. Shortly after Mr. Charriez's trial, Gough

was promoted to the Homicide Bureau, a plum post. Thereafter, he was continually promoted within the Homicide Bureau until he was made Bureau Chief of Homicide Bureau at the KCDA, one of the most desirable position in the KCDA with pay commensurate to the position.

145.    The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the KCDA, namely:

   a.   The institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

   i.   The duty not to use false, misleading or unreliable evidence, testimony, statements or arguments during criminal proceedings, including bail hearings, pretrial hearings, and trial;

   ii.   The continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and arguments whenever such misconduct is discovered, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

   iii.   The continuing duty to obtain, preserve and make timely disclosure to the appropriate parties, including the court and

the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information.

b.  The failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

146.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs were implemented or tolerated by policymaking officials for Defendant City of New York, including, but not limited to, the District Attorney of Kings County and his delegates, who knew:

a.  To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.  That such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c.     That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

147.   The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a.     Numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs, had wrongfully withheld evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady* and/or had presented or failed to correct false or misleading testimony and argument

b.     Civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of criminal activity;

c.     Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

d.     Judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately

train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see e.g., Walker v City of New York*, 974 F2d 293 (2d Cir. 1992); *Ramos v City of New York*, 285 AD2d 284 (1st Dept. 2001); *Leka v City of New York*, 257 F3d 89 (2d Cir. 2001);

e.  The inherent obviousness of the need to train, supervise, and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

148.  Despite this knowledge, the supervisory and policymaking officials of Defendant City of New York perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train, and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

149.  The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City of New York were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

150. Under the principle of municipal liability for federal civil rights violations, the KCDA has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable evidence, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

151. The District Attorney of Kings County, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to the KCDA's performance of its duties.

152. The District Attorney of Kings County at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant City of New York, and the Office was and is funded out of the City's budget.

153. Furthermore, the District Attorney of Kings County was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (NY County Law §§ 53, 941) that the City's constituent counties, and hence Defendant City of New York itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

154. The District Attorney of Kings County, Charles J. Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

155.    During all times material to this Complaint, Defendant City of New York, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

156.    By virtue of the foregoing, Defendant City of New York, is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

157.    It was not until the election of Kenneth Thompson and subsequently, Eric Gonzalez, that KCDA has again begun to fulfill its constitutional obligations and restored honor, integrity and distinction to the office of the KCDA.

## JURY DEMAND

158.    Pursuant to the powers given Citizens of the United State by virtue of the Seventh Amendment of the United States Constitution, the plaintiff demands trial by jury.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

a.    For damages not less than $50,000,000;

b.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

c.    For pre-judgment interest as allowed by law; and

d.    For such other and further relief as this Court may deem just and proper.

Dated:          New York, New York
                March 24, 2023


                                        LAW OFFICES OF ADAM J. ROTH, P.C.


                                                s/_____

                                                Adam J. Roth, Esq.
                                        112 West 34th Stret, Floor 18
                                        New York, New York 10120
                                                (212) 922-3741
                                                ajr@loajr.com


                                        LAW OFFICES OF ROBERT C. REULAND, P.C.


                                                /s/_____

                                        ROBERT C. REULAND, ESQ.
                                        26 Court Street, Suite 1400
                                        Brooklyn, New York 11242
                                                718-300-0626
                                        robert@reulandlaw.com


                                        AIDALA, BERTUNA & KAMINS, P.C.


                                                /s/_____

                                        ARTHUR L. AIDALA, ESQ.
                                                546 Fifth Avenue
                                        New York, New York 10036
                                                212-486-0011
                                        aidalaesq@aidalalaw.com